1  Thomas C. Richardson (State Bar No. 244461)
   trichardson@rutan.com
2  RUTAN & TUCKER, LLP
   611 Anton Boulevard, Suite 1400
3  Costa Mesa, California 92626-1931
   Telephone:  714-641-5100
4  Facsimile:   714-546-9035

5  Attorneys for Defendant, PICKY PAM AT THE
   BEACH, LLC
6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11 | LARADA SCIENCES, INC., a Delaware | Case No. 8:15-cv-02019 JLS (DFMx)
   | corporation; and UNIVERSITY OF    |
12 | UTAH RESEARCH FOUNDATION, a       | **MEMORANDUM OF POINTS AND**
   | Utah nonprofit corporation,       | **AUTHORITIES IN SUPPORT OF**
13 |                                   | **DEFENDANT PICKY PAM AT THE**
   |          Plaintiff,               | **BEACH, LLC'S MOTION TO**
14 |                                   | **DISMISS PURSUANT TO RULE**
   |     vs.                           | **12(b)(6)**
15 | PICKY PAM AT THE BEACH, LLC, a    |
   | California limited liability company, |
16 |                                   | **Date:        February 26, 2016**
   |          Defendant.               | **Time:        2:30 p.m.**
17 |                                   | **Ctrm:        10A**

18                                      **(Filed concurrently with Notice of**
                                        **Motion and Motion to Dismiss;**
19                                      **[Proposed] Order: Declaration of**
                                        **Thomas C. Richardson; and**
20                                      **Declaration of Pam Skinner)**

21

22

23

24

25

26

27

28

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION .................................................................................1

II. BACKGROUND ..................................................................................2

    A.  The Parties.................................................................................2

    B.  The State of the Art Prior to Plaintiffs Alleged "Invention" ...............2

    C.  The History of Plaintiffs Alleged "Invention"......................................4

    D.  The Prosecution History of the Patents-In-Suit ..................................5

        1.  Rejection Over Dolev ...................................................................6

        2.  Overcoming Dolev Based On Air Being Forced "Directly At" The Scalp...............................................................7

        3.  Forcing Air "Directly At" The Scalp Is Not An Invention ........8

III. LEGAL STANDARD ........................................................................9

IV. ARGUMENT .....................................................................................12

    A.  The Claims of the Patents-In-Suit Are Directed to Patent-Ineligible Subject Matter.............................................................13

        1.  The Relationship Between Air and Lice/Lice Eggs Is a Law of Nature ..................................................................14

    B.  A Simple Application Of A Law Of Nature Is Not Patentable .............................................................................15

    C.  There Are No Additional Elements in the Claims Sufficient to "Transform the Nature of the Claim" Into a Patent-Eligible Application.................................................16

        1.  The "Device" Limitations.............................................................17

        2.  Limitations Regarding Heating A Volume Of Air To Form Heated Air..................................................................17

        3.  Specific Temperature, Airflow, and Timing Limitations .......18

        4.  Limitations Requiring Defining a Target Area On An Animal or Human Are Abstract Ideas ...................................19

        5.  "Institutional" .............................................................................20

        6.  "Handheld" ..................................................................................21

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-i-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

**Page**

7.      Dependent Claim Limitations Requiring Systematically Applying The Heated Air To The Target Area Utilizing A Device To Separate And Lift Hair Within The Target Area...............................................21

8.      Limitations Requiring The Ectoparasite Be A Head Louse And The Animal Be A Mammal Or Human ................22

D.      The Claims Of The Patents-In-Suit Improperly Preempt A Law Of Nature......................................................................22

V.      CONCLUSION ...........................................................................24

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

-ii-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**FEDERAL CASES**

4

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,

5

   728 F.3d 1336 (Fed. Cir. 2013) ............................................................22

6

*Alice Corp. v. CLS Bank Int'l*,

7

   134 S. Ct. 2347 (2014) ..........................................9, 11, 13, 17, 20, 21

8

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,

9

   788 F.3d 1371 (Fed. Cir. 2015) .....................................................12, 23

10

*Bell Atl. Corp. v. Twombly*,

   550 U.S. 544 (2007) .......................................................................9, 10

11

12

*Bilski v. Kappos*,

   561 U.S. 593, 602 (2010) ....................................................................9

13

*buySAFE, Inc v. Google, Inc.*,

14

   765 F.3d 1350 (Fed. Cir. 2014) ..........................................................9

15

*Cogent Medicine, Inc. v. Elsevier Inc.*,

16

   2014 U.S. Dist. LEXIS 139856 (N.D. Cal. Sep. 30, 2014)..................9

17

*CyberSource Corp. v. Retail Decisions, Inc.*,

18

   654 F.3d 1366 (Fed. Cir. 2011) .........................................................10

19

*Dealertrack, Inc. v. Huber*,

20

   674 F.3d 1315 (Fed. Cir. 2012) ..........................................................9

21

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*,

   774 F.3d 755 (Fed. Cir. 2014) ................................................10, 12, 16

22

23

*Internet Patents Corp. v. Active Network, Inc.*,

   790 F.3d 1343 (Fed. Cir. 2015) ..........................................................9

24

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,

25

   132 S. Ct. 1289 (2012) ...................1, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22

26

*Mendiondo v. Centinela Hosp. Med. Ctr.*,

27

   521 F.3d 1097 (9th Cir. 2008) ............................................................9

28

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-iii-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

**Page(s)**

**FEDERAL CASES (CONT.)**

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S. Ct. 2238 (2011) .......................................................................... 10

*OIP Techs., Inc. v. Amazon.com, Inc.,*
    788 F.3d 1359 (Fed. Cir. 2015) ............................................................. 9

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) ................................................... 9, 10, 11

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC,*
    2015 U.S. App. LEXIS 22681 (Fed. Cir. Dec. 28, 2015) ...................... 9

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.,*
    588 F.3d 659 (9th Cir. 2009) ................................................................. 9

**FEDERAL STATUTES**

35 United States Code
    section 101 ........................................... 1, 9, 10, 11, 13, 17, 20, 21, 22, 24

**RULES**

Federal Rules of Civil Procedure
    rule 12(b)(6) ...................................................................................... 1, 9

**OTHER AUTHORITIES**

U.S. Patent No. 5,261,427 .......................................................................... 7

U.S. Patent No. 7,789,902 .................................................. 1, 1, 2, 5, 6, 14, 20, 21, 24

U.S. Patent No. 8,162,999 .................................................. 1, 2, 5, 6, 8, 14, 20, 21, 24

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

-iv-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1    **I.     INTRODUCTION**

2         Defendant PICKY PAM AT THE BEACH, LLC ("Defendant") submits this

3    memorandum of points and authorities in support of its Motion to Dismiss and

4    respectfully requests that the Court grant this motion and dismiss the Complaint

5    (Dkt. # 1) with prejudice pursuant to Federal Rules of Civil Procedure Rule 12(b)(6)

6    because Plaintiffs have failed to state a claim upon which relief can be granted, and

7    requests that the Court declare the claims of U.S. Patent No. 7,789,902 (the "'902

8    patent") and U.S. Patent No. 8,162,999 (the "'999 patent") (collectively "the

9    patents-in-suit") invalid under 35 U.S.C. § 101.

10        Plaintiffs have failed to state a claim and the patents-in-suit are invalid under

11   35 U.S.C. § 101 because the patents-in-suit are directed to a law of nature or

12   naturally occurring phenomenon.  It has long been settled that laws of nature, such

13   as natural correlations or relationships in nature, may not be patented, no matter how

14   novel the discovery of that correlation or relationship might be.  *See e.g.*, *Mayo*

15   *Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012).  Also, a law

16   of nature cannot be patented if it involves nothing more than well-known, routine,

17   conventional, or obvious steps to apply the law of nature.  *See id.*

18        The claims of the patents-in-suit asserted in this case are similar to what the

19   Supreme Court said was not patentable in *Mayo v. Prometheus*—well-known,

20   routine and conventional methods of applying a law of nature. Specifically, the

21   claims of the patents-in-suit all revolve around the natural effect of ectoparasites,

22   e.g., head lice, dehydrating and dying when exposed to hot, dry air. In other words,

23   the inventors claim to have discovered natural relationships between natural living

24   organisms and hot, dry air—laws of nature that are not patent eligible.

25        If the patent-ineligible laws of nature present in every claim are set aside, the

26   claims do not contain any "inventive concept," which the Supreme Court has said is

27   required to transform a method involving a patent-ineligible law of nature into a

28   patent-eligible invention.  The method claims of the patents-in-suit merely apply the

Rutan & Tucker, LLP
attorneys at law
2594/101882-0003
9236790.1 a01/29/16
-1-
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1  observed natural relationships in routine, conventional, and obvious pre-solution

2  ways, which are unpatentable.  The Court should find the '902 patent and the '999

3  patent invalid for being directed to patent ineligible subject matter and dismiss this

4  case before any additional resources are spent to reach this inevitable conclusion.

5  **II.     BACKGROUND**

6      **A.     The Parties**

7      Defendant is a small limited liability company organized under the laws of

8  the State of California and has only one small office, which is located in Huntington

9  Beach, CA.  (*See* Declaration of Pam Skinner in Support of Defendant Picky Pam at

10  the Beach, LLC's Motion to Dismiss ("Skinner Decl.") ¶ 2.)

11      Plaintiffs have accused Defendant of infringing the patents-in-suit based on

12  sales of "The Lice Device" and "The Dehydration Station," which Plaintiffs allege

13  are used in methods that infringe the method claims of the patents-in-suit.  (*See* Dkt.

14  # 1.)  With respect to these devices, to date, Defendant has sold fewer than 25 units

15  total for total gross revenue of less than $44,000.  (Skinner Decl., ¶ 3.)  Defendant

16  has only very limited revenue and resources.  (Skinner Decl., ¶ 4.)

17      Plaintiff Larada Sciences, Inc. ("Larada"), on the other hand, is a much larger

18  corporation organized under the laws of the State of Delaware with yearly revenue

19  estimated to be upwards of $10 million (many times larger than Defendant's yearly

20  revenue).  (*See* Skinner Decl. ¶ 5, Ex. A; Dkt. #1.)

21      Considering the Defendant's limited resources and revenue, it is extremely

22  important to Defendant to have this case resolved early because Defendant does not

23  have the resources likely required for extended litigation.  (Skinner Decl., ¶ 4.)

24      **B.     The State of the Art Prior to Plaintiffs Alleged "Invention"**

25      For many years before the patents-in-suit, it was known that one could use

26  heated air to dehydrate and kill lice.  (*See e.g.*, Declaration of Thomas C.

27  Richardson in Support of Defendant Picky Pam at the Beach, LLC's Motion to

28  Dismiss ("Richardson Decl."), ¶¶ 5, 6, 8, 10–12, and 16–18; Ex. 2 at p. 62, Ex. 3,

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

-2-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

Ex. 5 at p. 72, Ex. 7 at p. 118; Ex. 8 at p. 156, Ex. 9, Ex. 13 at p. 200, Ex. 14 at p. 206, and Ex. 15.)  For example, a school health handbook from 1984 (more than 30 years ago) instructed school nurses and others that head lice could by killed by directing heated air within the temperature range claimed in the patents-in-suit directly at the head from a blow dryer.  (*See e.g.*, Richardson Decl., ¶ 11, Ex. 8 at p. 156.)  Other prior publications have also recommended using heated air, e.g., from a blow dryer, to kill lice on humans for many years.  (*See e.g.*, Richardson Decl., ¶¶ 5, 6, 10–12, 16 and 17; Ex. 2 at p. 62, Ex. 3, Ex. 7 at p. 118; Ex. 8 at p. 156, Ex. 9, Ex. 13 at p. 200, and Ex. 14 at p. 206.)

Even Dr. Clayton and his fellow inventors, in an article published in a pediatrics journal in 2006, recognized that "[n]early 60 years ago" a researcher had "pointed out that body lice . . . die when exposed to 51°C air for 5 minutes" and, another researcher "reported that body lice can be killed in vitro with air from a blow-dryer at 50°C for 5 minutes and that body louse eggs fail to hatch in vitro after exposure to hot air at 55°C for 90 seconds."  (Richardson Decl., ¶ 8, Ex. 5 at p. 72.)  Dr. Clayton and his co-authors observed that "[h]ot air probably kills the lice and eggs by desiccating them. The high surface/volume ratio of small anthropods, such as lice, makes them vulnerable to control by desiccation, as has been shown for lice on birds."  (*Id.*)

Anyone who both had lice (knowingly or unknowingly) and used a blow dryer or had their hair done with a blow dryer in the last 30 years would have inevitably eliminated at least some of the lice/lice eggs with heated air from the blow dryer.  For example, a booklet published in 1997 discussing treating "head lice" supports this stating, "[t]he simplest cure for head lice in those how have short hair is daily shampooing and blow drying. The heat from a blow dryer is often sufficient to destroy both the mites and their eggs, which is why when a family becomes infected, it is often the father who suffers least."  (*See* Richardson Decl., ¶ 10, Ex. 7 at p. 118.)  Further, the inventors of the patents-in-suit tested "standard

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-3-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

handheld blow-dryer[s] (Conair, Stamford, CT)" and determined that they operate within a temperature range of 52–67°C with a mean temperature of 58.5°C (which is within the range claimed in the patents-in-suit) and operate with an air flow volume of 41 cubic feet/min (cfm) (which is within the range claimed in the patents-in-suit), and were effective at killing lice.  (Richardson Decl., ¶ 8, Ex. 5 at p. 74 [Table 1].) Specifically, the "standard handheld blow-dryers" tested in the "handheld blow-dryer directed heat" method were determined to kill 55.3% of hatched lice in addition to killing 97.9% of eggs.  (*Id.*)

**C.     The History of Plaintiffs Alleged "Invention"**

When Dale Clayton, the first named inventor on the patents-in-suit, moved to Utah he noticed that lice naturally died on the animals he was testing because of the dry air in Utah and observed that even hot air circulating from a heater in a building can kill lice on an animal.  (Richardson Decl., ¶ 15, Ex. 12 [Video clip at 00:17–00:49].)  In their own words, Plaintiffs have described the history of the alleged invention of the patents-in-suit, as follows:

> During the 1980's and early 1990's Dr. Clayton successfully cultured lice on captive birds, such as common pigeons, for basic research purposes. However, when he moved his lab to the University of Utah in 1996, from Oxford University in England, he encountered great difficulty keeping lice alive on captive birds. Perplexed, he consulted colleagues working on other small insects, such as fruit flies. He was informed that, because of Utah's arid climate, they too had difficulty keeping insect cultures alive. The large surface to volume ratio of these small insects apparently makes them vulnerable to desiccation in such an arid climate. One solution was to install steam lines in insect culture rooms to increase the ambient humidity. Upon installing such lines in his bird rooms, Clayton found that the problem was resolved and

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

-4-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1    feather lice were relatively easy to culture.

2

3    Around this time, Dr. Clayton's elementary school children

4    contracted head lice that appeared to be resistant to chemical

5    shampoos. Clayton's experience with pigeon lice suggested it

6    might be possible to control head lice by reducing the level of

7    humidity near the scalp.

8  (Richardson Decl., ¶ 7, Ex. 4.)  In other words, Dr. Clayton observed a law of nature

9  killing lice and thought to apply the law of nature to kill lice on his children.

10       Between September 2001 to February 2005, Dr. Clayton and his fellow

11 inventors conducted experiments using hot, dry air to kill lice on 169 people and

12 published their results in a pediatrics journal in 2006.  (Richardson Decl., ¶ 8, Ex. 5

13 at p. 75.)  Dr. Clayton and his co-authors indicated that the methods tested the

14 earliest in their experiments were the methods involving a bonnet-style hair dryer

15 and methods involving a handheld blow-dryer, and methods tested later in the

16 process involved using their own "Lousebuster" device.  (Richardson Decl., ¶ 8, Ex.

17 5 at p. 77–78.)  As can be seen in Table 1 and Figure 2 of their article, all of the

18 methods involving heated air tested between September 2001 and February 2005

19 resulted in the deaths of at least some hatched lice and 88.8% or higher mortality for

20 lice eggs.  (Richardson Decl., ¶ 8, Ex. 5 at p. 74, 76 [Table 1 and Figure 2].)

21 Ultimately, in every tested method, the inventors merely confirmed the law of nature

22 that heated air will kill lice/lice eggs.

23       **D.    The Prosecution History of the Patents-In-Suit**

24       The '902 patent was filed on November 23, 2005 and the '999 patent was

25 filed on September 3, 2010, and each of the patents-in-suit claim priority as

26 continuations-in-part to an application filed May 18, 2005 and a provisional patent

27

28

Rutan & Tucker, LLP
attorneys at law
2594/101882-0003
9236790.1 a01/29/16
-5-
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1   application filed on May 19, 2004.[1]  (Richardson Decl., ¶¶ 13–14, Exs. 10–11.)

2                 **1.**       **Rejection Over Dolev**

3        During prosecution of the '902 patent (i.e., the parent application to the '999

4   patent), the United States Patent and Trademark Office ("USPTO") rejected the

5   pending claims as unpatentable over U.S. 5,261,427 to Dolev ("Dolev"), which

6   teaches nearly all of the limitations of the of claims of the patents-in-suit.

7   (Richardson Decl., ¶ 4, Ex. 1 at p. 19–27; *see also* ¶ 12, Ex. 9.)

8        Dolev is directed to "a comb for destroying parasites in mammals such as

9   fleas, lice, lice eggs and the like <u>by direct application of heat to the affected area</u>."

10   (Richardson Decl., ¶ 12, Ex. 9 [Dolev, col. 1:6–10].)  Dolev described that prior art

11   methods of killing lice included exposing lice and lice eggs to temperatures of "55

12   degrees C" for 5 minutes or hotter temperatures for shorter time periods.

13   (Richardson Decl., ¶ 12, Ex. 9 [Dolev, col. 2:3–9].)  Dolev also described applying

14   these temperatures "to the scalp," but cautioned that this prior art method may risk

15   "burning the scalp skin."  (Richardson Decl., ¶ 12, Ex. 9 [Dolev, col. 2:3–9].)

16   Accordingly, Dolev stated, "it is a principal object of the present invention to

17   overcome the above-mentioned disadvantages of prior art lice treatment methods."

18   (Richardson Decl., ¶ 12, Ex. 9 [Dolev, col. 2:20–24].)

19        Dolev attempted to improve on the prior art methods that involved directing

20   heated air directly at the scalp (methods more than 30 years old as discussed above)

21   by providing a heated air device that includes a construct designed to deflect the

22   heated air away from the scalp up to the eggs and lice near the scalp, as can be seen

23   for example in FIG. 4 of Dolev reproduced below.

24

25

26

27   [1]   At least the claims of the '902 patent are not entitled to the priority date of the
provisional patent application, because all the claims require an air flow range not

28   disclosed in the provisional patent application.

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-6-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

FIG. 4

### 2. Overcoming Dolev Based On Air Being Forced "Directly At" The Scalp

In response to the rejection of the pending claims based on Dolev, the applicants amended the independent claims to require that "at least a substantial portion of the heated air is forced <u>directly at</u> the animal's scalp from a device for delivering the heated air" (this limitation or slight variations thereof appear in each of the independent claims of the patents-in-suit).  (Richardson Decl., ¶ 4, Ex. 1 at p. 28– 35 (emphasis added).)  The applicants argued that the amended claims should be allowed because "Dolev very clearly fails to disclose or suggest applying heated air 'directly to' the scalp" as the claims now required.  (*Id.* at ¶ 4, Ex. 1 at p. 41.)

The USPTO allowed the amended claims and gave the following reasons for allowing the claims: "The prior art does not teach or fairly suggest a method of eliminating an ectoparasite infestation that combines a heated air temperature range, an airflow range where <u>the heated air is applied directly to a subjects hair and scalp</u> such that at least a substantial portion of <u>the heated air is forced directly at the scalp of the subject</u>. The closest prior art is U.S. Patent No. 5,261,427 to Dolev which teaches a comb for the destruction of lice and lice eggs (title). <u>Dolev, however, fails to disclose a temperature range and airflow as well as forcing a substantial amount of the heated air directly at the subject's scalp</u>."  (Richardson Decl., ¶ 4, Ex. 1 at p.

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-7-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

51.)  While the reasons for allowance mention a failure of Dolev to teach the specific temperatures and airflow, the main reason for allowance was that Dolev allegedly did not teach "forcing a substantial amount of the heated air directly at the subject's scalp."  (*See id.*)  Indeed, Dolev does, in fact, teach using heated air at a temperature of "55 degrees C" to kill lice and eggs, which is within the temperature range claimed in the patents-in-suit.  (Richardson Decl., ¶ 12, Ex. 9 [Dolev, col. 2:3–9].)  Further, the USPTO had previously found that the airflow was obvious, and the USPTO did not require any airflow limitations in the subsequent '999 patent claims.  (Richardson Decl., ¶ 4, Ex. 1 at p. 19–27; and ¶ 14, Ex. 11.)  Thus, it is apparent that the claims of the patents-in-suit were allowed primarily based on the limitation requiring that the heated air be forced "directly" at the scalp.

### 3.    Forcing Air "Directly At" The Scalp Is Not An Invention

Directing heated air "directly at" the scalp is not an invention.  People have been directing blow dryers "directly at" the scalp for decades.  Further, prior to the patents-in-suit people were already using standard blow-dryers and directing heated air directly at the scalp specifically to kill lice and eggs.  (*See e.g.*, Richardson Decl., ¶¶ 5, 6, 10–12, 16 and 17; Ex. 2 at p. 62, Ex. 3, Ex. 7 at p. 118; Ex. 8 at p. 156, Ex. 9, Ex. 13 at p. 200, and Ex. 14 at p. 206.)  Dolev was meant to be an improvement on these prior art methods by addressing the concern that the prior art methods might cause some burning of the scalp, and adding a design that deflected the heated air away from the scalp.  (Richardson Decl., ¶ 12, Ex. 9 [Dolev, col. 2:3–9, 20–24].)  In amending to require that air be directed at the scalp, the inventors of the patents-in-suit did little more than observe that the improvement of Dolev, i.e., deflecting the heated air, was not necessary and return to the previous prior art methods.

However, it is not an invention to observe that prior art methods work fine and an intervening invention is unnecessary.  For example, if you have soap and someone invents "soap on a rope," a third party cannot come along and claim they have invented "soap on a rope without the rope," because this is just soap.

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

-8-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

## III.   LEGAL STANDARD

Pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure to state a claim upon which relief can be granted for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *See Twombly*, 550 U.S. at 558-59, 570; *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (*Twombly* requirements "apply in all civil cases").

Whether a patent claim is patent-eligible under 35 U.S.C. § 101 is a threshold inquiry suitable for resolution on a motion to dismiss. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012); *see also Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (describing Section 101 as "a threshold test."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 712 (Fed. Cir. 2014).  Since the Supreme Court decision in *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), numerous courts have granted 12(b)(6) motions and dismissed cases based on a finding of patent ineligibility under 35 U.S.C. § 101. Deciding patent eligibility at the outset of a case has not only been deemed acceptable by the Federal Circuit, it has been encouraged in order to avoid costly litigation.  *See generally buySAFE, Inc v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1349 (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Ultramercial*, 772 F.3d at 712; *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, 2015 U.S. App. LEXIS 22681 (Fed. Cir. Dec. 28, 2015); *see also Cogent Medicine, Inc. v. Elsevier Inc.*, 2014 U.S. Dist. LEXIS 139856 at *8 (N.D. Cal. Sep. 30, 2014) (granting motion to dismiss on Section 101

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16                                    -9-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1  grounds at the outset of the case).  In *Ultramercial*, the Federal Circuit explained the

2  rationale for addressing patent eligibility early in a case as follows:

3         From a practical perspective, addressing section 101 at the outset of

4         litigation will have a number of salutary effects. First, it will

5         conserve scarce judicial resources. Failure to recite statutory subject

6         matter is the sort of "basic deficiency," that can, and should, "be

7         exposed at the point of minimum expenditure of time and money by

8         the parties and the court," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

9         558 (2007) . . . .

10

11        Second, resolving subject matter eligibility at the outset provides a

12        bulwark against vexatious infringement suits. The scourge of

13        meritless infringement claims has continued unabated for decades

14        due, in no small measure, to the ease of asserting such claims and

15        the enormous sums required to defend against them. Those who

16        own vague and overbroad business method patents will often file

17        "nearly identical patent infringement complaints against a plethora

18        of diverse defendants," and then "demand . . . a quick settlement at

19        a price far lower than the cost to defend the litigation."

20  *Ultramercial*, 772 F.3d at 718–19 (Mayer, J. concurring).

21        Further, "[i]ssues of patent-eligible subject matter are questions of law" and

22  no presumption of validity exists.  *CyberSource Corp. v. Retail Decisions, Inc.*, 654

23  F.3d 1366, 1369 (Fed. Cir. 2011); *see also In re BRCA1- & BRCA2-Based*

24  *Hereditary Cancer Test Patent Litig.*, 774 F.3d 755, 759 (Fed. Cir. 2014) (stating

25  that "[t]he ultimate question of patent eligibility under § 101 is an issue of law").

26  The Supreme Court has stated that the clear and convincing standard "applies to

27  questions of fact and not to questions of law." *Microsoft Corp. v. i4i Ltd. P'ship*,

28  131 S. Ct. 2238, 2253 (2011) (emphasis added).  The clear and convincing evidence

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-10-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

standard does not apply to § 101 analysis.  *See Ultramercial*, 772 F.3d at 720–21 (Mayer, J., concurring) ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility.  The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts . . . no equivalent presumption of eligibility applies in the section 101 calculus.").

The Supreme Court has held that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable" under 35 U.S.C. § 101.  *Alice*, 134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics., Inc.*, 133 S. Ct. 2107, 2116 (2013)). Therefore, a § 101 analysis requires a Court to determine "whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355.  If the Court "determine[s] that the claims at issue are directed to one of those patent-ineligible concepts, [the Court] must determine whether the claims contain 'an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (citations omitted).

A two-step analysis is used to determine what is and what is not patent eligible.  First, a court must decide whether the claims at issue are directed to one of the three patent-ineligible concepts. *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1296-97). If so, then the court must look to the rest of the claim to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297-98).  A law of nature can be characterized as a "relation [that] itself exists in principle apart from any human action." *See Mayo*, 132 S. Ct. at 1297.

In the case where method or process claims set forth laws of nature, like those in question here, the "inventive concept" inquiry may focus on the additional steps in the claimed method.  A process reciting a law of nature is not patentable where

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-11-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1  the additional steps "involve well-understood, routine, conventional activity

2  previously engaged in by researchers in the field." *Mayo*, 132 S. Ct. at 1294.

3  "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient

4  to transform an unpatentable law of nature into a patent-eligible application of such

5  a law." *Id.* at 1298. Thus, process steps that recite techniques already known cannot

6  supply the inventive concept. *In re BRCA1*, 774 F.3d at 764 (invalidating method

7  claims based on abstract ideas that relied upon standard laboratory techniques); *see*

8  *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015)

9  ("[A]ppending routine, conventional steps to a natural phenomenon, specified at a

10  high level of generality, is not enough to supply an inventive concept.").

11        Simply applying patent-ineligible subject matter in a method does not render

12  the subject matter patentable. *See e.g.*, *Mayo*, 132 S. Ct. at 1294-95, 1297-98.

13  Method claims that "amount to nothing significantly more than an instruction to

14  doctors to apply the applicable laws [of nature] when treating their patients" are

15  invalid. *Id.* Further, the Supreme Court concluded that telling someone to engage in

16  "well-understood, routine, conventional activity previously engaged in by scientists

17  who work in the field" is not enough to confer patent eligibility. *Id.* at 1298.  The

18  Federal Circuit reached a similar conclusion in assessing steps in methods for

19  screening for a genetic mutation. *In re BRCA1*, 774 F.3d at 761-63.  In holding the

20  claims invalid, the Federal Circuit concluded that the claimed steps for comparing

21  gene sequences—which recited common laboratory techniques such as amplifying

22  genes using PCR, hybridization with gene probes, and sequencing DNA—involved

23  techniques that people were already using before the patents were filed, and did "not

24  add 'enough' to make the claims as a whole patent-eligible." *Id.* at 763-64. In other

25  words, methods using known techniques to apply a law of nature do not meet the

26  "inventive concept" prerequisite for patent eligibility.

27  **IV.   ARGUMENT**

28        Defendant's motion to dismiss should be granted because the patents-in-suit

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-12-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

are directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Applying the two-step test for patent eligibility under 35 U.S.C. § 101 as set forth by the Supreme Court, it is apparent that (1) the claims of the patents-in-suit are directed to patent-ineligible subject matter, i.e., laws of nature, and (2) there are no additional elements in the claims sufficient to "transform the nature of the claim" into a patent-eligible application.  *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1296-97).  Additionally, (3) the claims of the patents-in-suit improperly attempt to preempt use of the laws of nature .

**A.     The Claims of the Patents-In-Suit Are Directed to Patent-Ineligible Subject Matter**

The asserted claims of the patents-in-suit are directed to patent-ineligible subject matter under 35 U.S.C. § 101.  The Supreme Court has held that laws of nature, natural phenomena, and abstract ideas are not patentable subject matter. *Alice*, 134 S. Ct. at 2354.  The claims of the patents-in-suit are improperly directed to laws of nature and are patent-ineligible.  A law of nature can be characterized as a "relation [that] itself exists in principle apart from any human action." *See Mayo*, 132 S. Ct. at 1297.

As summarized in the claim charts regarding the patents-in-suit attached as Ex. A and Ex. B to the Richardson Declaration, each claim of the patents-in-suit is directed to one or more patent-ineligible laws of nature, i.e., regarding the natural relationship between air and ectoparasites (e.g., lice).  (*See e.g.*, Richardson Decl., ¶¶ 2–3, Exs. A and B.)  The focus of all the claims of the patents-in-suit is on "eliminating an ectoparasite infestation" as stated in the preamble of each independent claim.  (*See* Richardson Decl., ¶¶ 13–14, Exs. 10–11.)  In the claim of the patents-in-suit, the killing of ectoparasites (e.g., lice) occurs when heated air at a temperature from about 54°C to about 65°C impinges directly on ectoparasites on an animal's or human's head with the heated air applied directly to the hair and scalp such that at least a substantial portion of the heated air is forced directly at the scalp.

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16                         -13-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1   (*See* Richardson Decl., ¶¶ 13–14, Exs. 10–11.)  However, this is merely a simple

2   application of a law of nature, e.g., that heated air will kill ectoparasites (a fact that

3   occurs naturally of itself), and nothing else in the claims adds enough to make the

4   claims patentable.

5          **1.     The Relationship Between Air and Lice/Lice Eggs Is a Law**

6                 **of Nature**

7          All three independent claims of the '902 patent and all three independent

8   claims of the '999 patent involve applying heated air directly to ectoparasites as a

9   means of eliminating ectoparasites.  (*See* Richardson Decl., ¶¶ 13–14, Exs. 10–11.)

10  However, the relationship between air and ectoparasites or lice (e.g., that heated air

11  dehydrates and kills the ectoparasites) is a law of nature that "itself exists in

12  principle apart from any human action."  *See Mayo*, 132 S. Ct. at 1297.  It is a

13  consequence of the way the bodies of ectoparasites exist naturally in the world, and

14  how they naturally dehydrate/desiccate when exposed to heated, dry air.  In an

15  article published in a pediatrics journal in 2006, the inventors of the patents-in-suit

16  observed that "[h]ot air probably kills the lice and eggs by desiccating them.  The

17  high surface/volume ratio of small anthropods, such as lice, makes them vulnerable

18  to control by desiccation, as has been shown for lice on birds."  (Richardson Decl.,

19  ¶ 8, Ex. 5 at p. 72.)

20         The laws of nature or natural relationships between air and ectoparasites that

21  are the focus of the claims of the patents-in-suit can be stated a few different ways.

22  For example, in a very simple form, the law of nature may be stated as follows:

23  "heated air impinging directly on ectoparasites over time will kill the ectoparasites."

24  This is a law of nature that "itself exists in principle apart from any human action."

25  *See Mayo*, 132 S. Ct. at 1297.  A human does not need to do anything to cause this;

26  rather, the relationship is simply a fact that exists in nature.

27         The law of nature or natural relationships between air and ectoparasites can

28  also be stated with more detail such that it more closely follows the claim language.

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16

-14-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1    For example, the law of nature may be stated as follows: "if ectoparasites are

2    exposed to air at a temperature from about 54°C to about 65°C impinging directly

3    on the ectoparasites on an animal's head at an airflow rate of about 25 cfm to about

4    125 cfm, wherein the heated air is applied directly to the animal's hair and animal's

5    scalp such that at least a substantial portion of the heated air is forced directly at the

6    animal's scalp, the ectoparasites will die over time."  This is also law of nature that

7    "itself exists in principle apart from any human action."  *See Mayo*, 132 S. Ct. at

8    1297.  The additional details, e.g., regarding temperatures, airflow rates, and air

9    being directed at a scalp, merely describe additional natural parameters of the law of

10   nature.  For example, a human does not have to do anything to the ectoparasite to

11   make the ectoparasite susceptible to these temperature and airflows; the ectoparasite

12   is naturally susceptible to these.

13        That these are laws of nature is confirmed by the Plaintiffs' description of the

14   history of the invention.  The Plaintiffs have admitted that the invention of the

15   patents-in-suit arose from Dale Clayton observing, when he moved to Utah, that lice

16   on animals he was testing would naturally die in the dry, hot air of Utah.  (*See*

17   Richardson Decl., ¶¶ 7 and 15, Exs. 4 and 12.)  Dale Clayton merely observed a law

18   of nature or natural phenomenon occurring, without having to do anything to cause

19   it.  Subsequently, Dale Clayton and the other inventors of the patents-in-suit tried to

20   claim applying heated, dry air to lice to kill the lice, which is merely a simple

21   application of the observed law of nature or natural relationship they observed

22   between heated, dry air and ectoparasites/lice.

23        **B.     A Simple Application Of A Law Of Nature Is Not Patentable**

24        The claims of the patents-in-suit are all method claims that are simple

25   applications of the laws of nature discussed above.  (*See* Richardson Decl., ¶¶ 13–

26   14, Exs. 10–11.)  For example, the claims include limitations requiring "applying

27   the heated air . . ." and "maintaining the heated air . . ." to kill ectoparasites (*See*

28   Richardson Decl., ¶¶ 13–14, Exs. 10–11.)  However, these simple applications of

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16                              -15-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1  the laws of nature regarding the relationship between air and lice are not patentable.

2      The Supreme Court has held that simply applying patent-ineligible subject

3  matter in a method does not render the subject matter patentable. *See e.g.*, *Mayo*,

4  132 S. Ct. at 1294-95, 1297-98.  Method claims that "amount to nothing

5  significantly more than an instruction to doctors to apply the applicable laws [of

6  nature] when treating their patients" are invalid.  *Id.*  Similarly, the mere fact that the

7  claims of the patents-in-suit in this case involve applying a law of nature when

8  treating a person is insufficient to make the claims patent-eligible subject matter.

9      Further, methods using known techniques to apply a law of nature do not

10  meet the "inventive concept" prerequisite for patent eligibility.  *See id.* at 1298.  For

11  example, the Supreme Court concluded that telling someone to engage in "well-

12  understood, routine, conventional activity previously engaged in" by people is not

13  enough to confer patent eligibility.  *Id.* at 1298.  Similarly, in holding claims

14  assessing steps in methods for screening for a genetic mutation invalid, the Federal

15  Circuit concluded that the claimed steps—which recited common laboratory

16  techniques such as amplifying genes using PCR, hybridization with gene probes,

17  and sequencing DNA—involved techniques that people were already using before

18  the patents were filed, and did "not add 'enough' to make the claims as a whole

19  patent-eligible."  *In re BRCA1*, 774 F.3d at 761-64.

20  **C.**   **There Are No Additional Elements in the Claims Sufficient to**

21      **"Transform the Nature of the Claim" Into a Patent-Eligible**

22      **Application**

23      As discussed below and as set forth in Ex. A and Ex. B to the Richardson

24  Declaration, there are no additional elements in the claims of the patents-in-suit that

25  would be sufficient to transform the nature of the claims of the patents-in-suit into

26  patent-eligible subject matter under the second part of the Supreme Court's test for

27

28

Rutan & Tucker, LLP
*attorneys at law*
2594/101882-0003
9236790.1 a01/29/16
-16-
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1  patent-ineligibility.[2]  *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1296-

2  97).  Examples of additional elements are discussed below:

3  **1.  The "Device" Limitations**

4  Defendant notes that various limitations recite generically that the air is

5  applied "from a device."  However, this is just a generic recitation of a device

6  without any specific structure identified.  The Supreme Court has indicated that a

7  generic recitation of a device cannot transform an otherwise patent-ineligible claim

8  into a patent-eligible claim, e.g., merely reciting that an abstract idea is performed

9  using a "computer" has been held insufficient to make a claim patent-eligible under

10  35 U.S.C. § 101.  *Alice*, 134 S. Ct. at 2357-58.  Similarly, merely reciting that a law

11  of nature is applied using a generic "device" cannot make the law of nature

12  patentable.

13  **2.  Limitations Regarding Heating A Volume Of Air To Form**

14  **Heated Air**

15  Limitations regarding heating a volume of air to form heated air involve only

16  "well-understood, routine, conventional" activities and cannot make the claims

17  patent-eligible.  *Mayo*, 132 S. Ct. at 1294. "Purely 'conventional or obvious' '[pre]-

18  solution activity' is normally not sufficient to transform an unpatentable law of

19  nature into a patent-eligible application of such a law."  *Id.* at 1298.

20  Heating a volume of air to form heated air is done daily in households and

21  hair salons throughout the United States that use a standard handheld blow-dryer,

22  and heating a volume of air to kill lice has been done for over 30 years.  (*See e.g.*,

23  Richardson Decl., ¶ 11, Ex. 8 at p. 156.)  Indeed, multiple publications describe

24  using a standard blow-dryer to heat a volume of air to form heated air, and blowing

25  ―――――――――――――――

26  [2]   While Defendant maintains that all of the limitations of the patents-in-suit are
directed to patent-ineligible subject matter, Defendant's discussion herein and in Ex.
A and Ex. B is focused on the claims specifically identified in the complaint as

27  allegedly infringed (and claims they depend from).  If Plaintiffs attempt to assert
claims not identified in the complaint, Defendant reserves its right to argue that

28  those claims are also invalid under 35 U.S.C. § 101, including for similar reasons.

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16                    -17-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

the heated air directly at a head to thereby kill lice and/or lice eggs.  (*See e.g.*, Richardson Decl., ¶¶ 5, 6, 10–12, 16 and 17; Ex. 2 at p. 62, Ex. 3, Ex. 7 at p. 118; Ex. 8 at p. 156, Ex. 9, Ex. 13 at p. 200, and Ex. 14 at p. 206.)  An example of using standard blow-dryers to kill lice includes a school health handbook published in 1984 and circulated to school nurses describes blowing hot air directly at an infested child's hair with a "good-grade hair dryer" using air temperatures "at about 120 to 140 degrees Fahrenheit" (or 49°C to 60°C, which overlaps the claimed ranges of the patents-in-suit) to kill lice.  (*See* Richardson Decl., ¶ 11, Ex. 8 at p. 156.)

Further, as reported by the inventors themselves, "standard handheld blow-dryer[s] (Conair, Stamford, CT)" that they tested operated within a temperature range of 52–67°C with a mean temperature of 58.5°C, which temperatures overlap the ranges claimed in the patents-in-suit.  (Richardson Decl., ¶ 8, Ex. 5 at p. 74, 76 [Table 1 and Figure 2].)

Accordingly, heating a volume of air to form heated air, even at the temperatures claimed in the patents-in-suit, was "well-understood, routine, conventional" and cannot make the claims patent-eligible. *Mayo*, 132 S. Ct. at 1294.

### 3.    Specific Temperature, Airflow, and Timing Limitations

The various claim limitations including temperature ranges, airflow ranges, and/or periods of time the ectoparasites are exposed to the air merely describe additional natural parameters of the law of nature.[3]  The temperatures, airflows, and exposure times are effective by their nature and this "exists in principle apart from any human action" and are part of the law of nature.  *See Mayo*, 132 S. Ct. at 1297. For example, a human does not have to do anything to the ectoparasite to make the ectoparasite susceptible to these temperatures, airflows, and exposure times; the ectoparasite is naturally susceptible to these.  Even if Plaintiffs claimed to have

---

[3]    Limitations requiring that the heated air be maintained for a period of time to effect a specific mortality rate fall into this category.  The mortality rate naturally correlates to the temperatures and timing, etc. as a law of nature.

Rutan & Tucker, LLP
*attorneys at law*

2594/101882-0003
9236790.1 a01/29/16                                              -18-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

1   discovered that certain parameters work better than others, this is merely discovery

2   of a naturally occurring relationship or phenomenon and cannot alone be patentable.

3          Further, even if these temperature, airflow, or timing parameters were

4   considered to add anything, what they add cannot be considered to involve anything

5   more than "well-understood, routine, conventional activity previously engaged in"

6   and "[p]urely 'conventional or obvious' '[pre]-solution activity' is normally not

7   sufficient to transform an unpatentable law of nature into a patent-eligible

8   application of such a law." *Id.* at 1298.  Indeed, multiple publications describe using

9   a standard blow-dryer to blow heated air directly at a head and thereby kill lice

10  and/or lice eggs.  (*See e.g.*, Richardson Decl., ¶¶ 5, 6, 10–12, 16 and 17; Ex. 2 at p.

11  62, Ex. 3, Ex. 7 at p. 118; Ex. 8 at p. 156, Ex. 9, Ex. 13 at p. 200, and Ex. 14 at p.

12  206.)  Further, as reported by the inventors themselves, "standard handheld blow-

13  dryer[s] (Conair, Stamford, CT)" tested prior to their patent application operated

14  within a temperature range of 52–67°C with a mean temperature of 58.5°C and at an

15  air flow volume of 41 cubic feet/min (cfm), and were effective at killing lice.

16  (Richardson Decl., ¶ 8, Ex. 5 at p. 74.)  Also, a school health handbook published in

17  1984 also describes blowing hot air with a "good-grade hair dryer" using air

18  temperatures "at about 120 to 140 degrees Fahrenheit" (or 49°C to 60°C, which

19  overlaps the claimed ranges of the patents-in-suit) to kill lice.  (*See* Richardson

20  Decl., ¶ 11, Ex. 8 at p. 156.)  Other references teach time periods for treatment.  (*See*

21  *e.g.*, Richardson Decl., ¶ 6, 17, 18, Exs. 3, 14, and 15.)  Thus, people using standard

22  blow-dryers to kill lice before the patents-in-suit were using the temperature,

23  airflow, and timing parameters claimed in the patents-in-suit these cannot make the

24  claims patent-eligible.  *Mayo*, 132 S. Ct. at 1294.

**4.    Limitations Requiring Defining a Target Area On An Animal or Human Are Abstract Ideas**

27         Each claim of the patents-in-suit recites an unpatentable abstract idea, i.e., the

28  limitations requiring "defining a target area" on an animal or human.  (*See*

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

-19-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

Richardson Decl., ¶¶ 13–14, Exs. 10–11.)  These claim limitations do not require that this "defining" limitation be accomplished in any particular way, and "defining a target area" is an abstract idea that could be done entirely within a person's head. Mental processes like "defining a target area" are not patent eligible.  Accordingly, this limitation cannot make any claims patent-eligible, and all the claims including this abstract idea are patent-ineligible.

### 5.    "Institutional"

Claim 14 of the '902 patent and claim 11 of the '999 patent recite in their preambles that the method is an "institutional method."  However, nothing in the remainder of the claim language says anything "institutional" or related, and it is not clear whether this recitation in the preamble is even a limitation.  In any case, merely including the word "institutional" once in the preamble cannot be sufficient to convert the claim into patent-eligible subject matter.

First, at most, this is just a generic recitation without any specific structure or features identified.  The Supreme Court has indicated that a generic recitation cannot transform an otherwise patent-ineligible claim into a patent-eligible claim, e.g., merely reciting that an abstract idea is performed using a "computer" has been held insufficient to make a claim patent-eligible under 35 U.S.C. § 101.  *Alice*, 134 S. Ct. at 2357-58.  Similarly, merely reciting that a law of nature is applied in an "institution" cannot make the law of nature patentable.

Second, institutional treatment is a "well-understood, routine, conventional activity previously engaged in" and cannot make the claim patent-eligible.  *Mayo*, 132 S. Ct. at 1294. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law."  *Id.* at 1298.  For example, school nurses were instructed in using a blow-dryer to kill lice well before the patents-in-suit.  (See e.g., Richardson Decl., ¶ 11, Ex. 8 at p. 156.)

### 6.   "Handheld"

Claim 21 of the '902 patent and claim 16 of the '999 patent recite in their preambles that the method is an "handheld method"; however, only claim 16 of the '999 patent recites "handheld" or anything similar in the body of the claim when it recites "from the handheld device."  Nonetheless, merely including the word "handheld" once in the preamble and once in the body of the claim cannot be sufficient to convert the claim into patent-eligible subject matter.

First, at most, "handheld method" and "handheld device" are just generic recitations without any specific structure or features identified.  The Supreme Court has indicated that a generic recitation cannot transform an otherwise patent-ineligible claim into a patent-eligible claim, e.g., merely reciting that an abstract idea is performed using a "computer" has been held insufficient to make a claim patent-eligible under 35 U.S.C. § 101.  *Alice*, 134 S. Ct. at 2357-58.  Similarly, merely reciting that a law of nature is applied in a "handheld method" or using a "handheld device" cannot make the law of nature patentable.

Second, treatment using a handheld blow-dryer is a "well-understood, routine, conventional activity previously engaged in" and cannot make the claim patent-eligible.  *Mayo*, 132 S. Ct. at 1294. For example, many publications prior to the patents-in-suit described using a standard blow-dryer to kill lice.  (*See e.g.*, Richardson Decl., ¶¶ 5, 6, 10–12, 16 and 17; Ex. 2 at p. 62, Ex. 3, Ex. 7 at p. 118; Ex. 8 at p. 156, Ex. 9, Ex. 13 at p. 200, and Ex. 14 at p. 206.)

### 7.   Dependent Claim Limitations Requiring Systematically Applying The Heated Air To The Target Area Utilizing A Device To Separate And Lift Hair Within The Target Area.

Systematically applying the heated air to a target area utilizing a device to separate and lift hair within the target area, including where the device is a comb device, is a "well-understood, routine, conventional activity previously engaged in" and "purely 'conventional or obvious' '[pre]-solution activity' is normally not

1  sufficient to transform an unpatentable law of nature into a patent-eligible

2  application of such a law." *Id.* at 1294, 1298.  For example, hair stylists and

3  individuals using standard handheld blow-dryers have applied heated air to a target

4  area on the head while using an attachment or comb to separate and lift hair long

5  before the patents-in-suit.  As one example, an article published on the internet on

6  November 1, 2002 describes "using a hot blow-dryer for 15 minutes, morning and

7  evening, in conjunction with thorough nit combing."  (Richardson Decl., ¶ 17, Ex.

8  14 at p. 206.)  Further, combs and comb-like attachments have been used with blow

9  dryers for many years.  (*See e.g.*, Richardson Decl., ¶¶ 12, 17, and 19, Exs. 9, 14,

10  and 16.)  There is nothing inventive in using a device/comb to separate and lift hair.

**8.      Limitations Requiring The Ectoparasite Be A Head Louse And The Animal Be A Mammal Or Human.**

13       Limitations specifying that the ectoparasite is a head louse and that the animal

14  treated is a mammal or human do not add anything that would make the claims

15  patent-eligible.  The laws of nature can be stated equally with the natural

16  relationships defined in terms of a head louse, lice, mammals, and humans.

17       Further, treating humans with heated air to eliminate a head louse or lice is a

18  "well-understood, routine, conventional activity previously engaged in" and cannot

19  make the claim patent-eligible. *Mayo*, 132 S. Ct. at 1294.  For example, many

20  publications preceding the patents-in-suit describe treating humans with heated air

21  to kill lice.  (*See e.g.*, Richardson Decl., ¶¶ 5, 6, 10–12, 16 and 17; Ex. 2 at p. 62,

22  Ex. 3, Ex. 7 at p. 118; Ex. 8 at p. 156, Ex. 9, Ex. 13 at p. 200, and Ex. 14 at p. 206.)

**D.      The Claims Of The Patents-In-Suit Improperly Preempt A Law Of Nature**

25       That the claims of the patents-in-suit are invalid under 35 U.S.C. § 101 as

26  being directed to patent-ineligible subject matter is also apparent because, under

27  Plaintiffs' reading, the claims would virtually preempt use of the laws of nature at

28  issue. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d

1336, 1344-45 (Fed. Cir. 2013) (claims held ineligible because they preempted all practical uses of an abstract concept)  However, while preemption can signal patent ineligibility, the absence of preemption "does not demonstrate patent eligibility." *Ariosa*, 788 F.3d at 1379.

In this case, using the Plaintiffs' interpretation of the claims, the claims of the patents-in-suit would preempt application of the law of nature that "if ectoparasites are exposed to air at a temperature from about 54°C to about 65°C impinging directly on the ectoparasites on an animal's head at an airflow rate of about 25 cfm to about 125 cfm, wherein the heated air is applied directly to the animal's hair and animal's scalp such that at least a substantial portion of the heated air is forced directly at the animal's scalp, the ectoparasites will die over time."  The claims of the patents-in-suit purportedly lock up this law of nature and prevent virtually anyone from applying this law of nature without infringing the patents.

For example, under Plaintiffs' reading, the claims of the patents-in-suit would cause anyone having lice and using a standard handheld blow-dryer to infringe their patent.  The inventors own experiments have confirmed that "standard handheld blow-dryers" operate in the temperature range and airflow range claimed by the patents-in-suit and effect a mortality rate of hatched lice at 55.3% and of lice eggs at 97.9%.  (*See* Richardson Decl., ¶ 8, Ex. 5 at p. 74.)  Accordingly, the claims of the patents-in-suit, as asserted by Plaintiffs, would preempt people from using a standard handheld blow-dryer to style their hair because this might result in infringement of the patents-in-suit.

Similarly, Plaintiffs might also make claims of infringement against hair salons across the country, because the hair salons might have a customer that has a few lice/lice eggs in their hair that are killed when the customer's hair is dried.  Not only did Plaintiffs experiments show that standard handheld blow-dryers kill lice and lice eggs, they also showed that bonnet-style hair dryers, e.g., as sometimes used in hair salons, killed lice and lice eggs.  (*See* Richardson Decl., ¶ 8, Ex. 5 at p.

74.) Patents that could purportedly preempt hair salons from operating because they might have a customer with lice or lice eggs in their hair cannot be valid.

Further, even nature itself could infringe the claims of the patents-in-suit. For example, air temperatures in Death Valley get as high as 57°C in the summer. (*See* Richardson Decl., ¶9 , Ex. 6 at p. 81.) Accordingly, if an animal or person having lice traveled to Death Valley in the summer, and the wind blew air on the animal's or person's head and killed any lice or other ectoparasite, then nature itself might be considered to be infringing claims of the patents-in-suit. While some limitations say that the air is directed "from a device," the term "device" is generic and undefined, so Plaintiffs might argue that the limitation is satisfied by the wind blowing through a window, vent, or fan onto a person's head. If nature could be considered to be infringing the patents-in-suit, it is unquestionable that the claims must be invalid under 35 U.S.C. § 101.

## V.    CONCLUSION

For the reasons stated herein, Defendant respectfully requests that the Court grant this Motion to Dismiss and declare each claim of the '902 patent and the '999 patent invalid.


Dated:  January 29, 2016                                 RUTAN & TUCKER, LLP
                                                         THOMAS C. RICHARDSON


                                                    By: */s/ Thomas C. Richardson*
                                                         Thomas C. Richardson
                                                         Attorneys for Defendant, PICKY
                                                         PAM AT THE BEACH, LLC

Rutan & Tucker, LLP
attorneys at law

2594/101882-0003
9236790.1 a01/29/16

-24-

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS